IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) NO. 3:14-cr-000195-1 |
| v. | ) |
| | ) JUDGE RICHARDSON |
| | ) |
| BOBBY GENE ERVIN | ) |

**MEMORANDUM OPINION**

Pending before the Court is Defendant's Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 116, "Motion"). Via the Motion, Defendant seeks a reduction of his 96-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP"), pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to his specific health profile, satisfies the requirement of "extraordinary and compelling reasons" necessary for this Court to grant "compassionate release"[1] under Section 3582(c)(1)(A)(i), and that compassionate release is otherwise appropriate in his case. The Government has filed a response in opposition (Doc. No. 119, "Response"), arguing that the Motion should be denied because Defendant has not established "extraordinary and compelling reasons for his release" and consideration of the 18 U.S.C. § 3553(a) factors counsels strongly against granting compassionate release.

---

[1] Motions like the instant Motion are generally known as ones for "compassionate release," and Defendant's requested relief appropriately can be referred to and conceived of as "compassionate release" or "sentence modification" (or "sentence reduction"). *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at n.2 (D. Utah Feb. 18, 2020) ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020).

BACKGROUND

On December 10, 2014, Defendant was charged in a single-count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Doc. No. 1). On May 17, 2017, Defendant pled guilty to the sole count of the indictment. (Doc. No. 105). On October 17, 2017, visiting United States District Judge Sean F. Cox sentenced Defendant to serve 96 months of imprisonment followed by 3 years of supervised release. (Doc. No. 114).[2] Defendant has been serving his sentence at FCI Talladega. According to BOP, Defendant's release date is April 25, 2023. *See Federal Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Mar. 3, 2021).

LEGAL STANDARDS FOR "COMPASSIONATE RELEASE"

Prior to 2018, only the Director of the Bureau of Prisons could move for compassionate release. The First Step Act amended 18 U.S.C. § 3582(c) to allow prisoners to move for compassionate release on their own behalf. *See* First Step Act of 2018, § 603, Pub. L. No. 115-391, 132 Stat. 5239. Now, under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act,[3] a district court *may* under certain circumstances grant a defendant's motion for compassionate release (hereinafter, "defendant-filed motion"). *See United States v. Jones*, 980 F.3d 1098, 1106 (6th Cir. 2020) ("Congress's use of 'may' in § 3582(c)(1)(A) dictates that the

---

[2] The undersigned took no part in the trial or sentencing of Defendant and indeed was at no point assigned to Defendant's case until the instant Motion was filed.

[3] That paragraph of Section 603 provides:

 (b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
  (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

compassionate release decision is discretionary, not mandatory."). In order to grant such a defendant-filed motion, however, a court must find that the so-called "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier." *See also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) (explaining that a district court may not disregard the exhaustion requirements of Section 3582(c)(1)(A)).

Once it properly can act on a defendant-filed motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court next determines whether, in its discretion, to grant compassionate release to a defendant. In its recently issued opinion in *Jones*, the Sixth Circuit discussed the steps of the compassionate release analysis:

> The three-step § 3582(c)(1)(A) test is as follows. At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i).12 At step two, a court must "find[ ]" whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id*. § 3582(c)(1)(A) (emphasis added). The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. *See* U.S.S.G. § 1B1.13 (U.S. Sent'g Comm'n 2018). Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." *Dillon* [*v. United States*], 560 U.S. [817,] 827 [(2010)]. At step three, "§ 3582(c)[ (1)(A) ] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *Id*.

*Jones*, 980 F.3d at 1108. The court then went on to resolve the following question with respect to defendant-filed motions (as opposed to compassionate-release motions filed BOP) in particular: "given the First Step Act's procedural reforms to compassionate release, is § 1B1.13 still an applicable—'that is, "relevant" or "appropriate,"' [*United States v. Ruffin*, 978 F.3d 1000, 1007–

08 (6th Cir. 2020)]—policy statement for the purposes of the second § 3582(c)(1)(A) inquiry?" *Id*. The court noted that this is a question that has "sharply divided the courts," *id*. (citation omitted), as many district courts, including this Court, previously considered the Section 1B1.13 policy statements applicable when determining whether compassionate release was warranted. The court then chose a side, holding that "the passage of the First Step Act rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release." *Id*. (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020)).[4] Therefore, "[u]ntil the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *Id*.

In other words, because § 1B1.13 is inapplicable to defendant-filed motions, a district court adjudicating such a motion is not bound by anything § 1B1.13 has to say about—including any limitations or requirements § 1B1.13 would impose upon—the finding of extraordinary and compelling reasons. But this rule is not the only consequence of the Sixth Circuit's decision in *Jones*. Another is that the district court, in adjudicating a defendant-filed motion, may disregard the requirement of § 1B1.13(2) that the court find the defendant not pose a danger (to any other person or to the community) in order to grant compassionate release.

If, in adjudicating a defendant-filed motion, a district court determines that "extraordinary and compelling reasons" for compassionate release exist, the court then determines whether compassionate release is warranted in light of the Section 3553(a) sentencing factors. *See Jones*,

---

[4] Prior to *Jones*, this Court treated § 1B1.13 as applicable to all motions for compassionate release, whether filed by BOP or by a defendant. The Court does not necessarily perceive that such treatment resulted in a resolution of any defendant-filed motions that was any different than the result the Court would have reached by treating § 1B1.13 as inapplicable to defendant-filed motions. But the Court does note that at least the analytical framework it used prior to *Jones* was different than the analytical framework it will use in the aftermath of *Jones*.

980 F.3d at 1112.[5] The sentencing factors set forth in Section 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
> i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
> ii) [in effect at the time of sentencing]
>
> (5) any pertinent policy statement—
> A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and
> B) [and in effect at the time of sentencing]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## ANALYSIS

### I. EXTRAORDINARY AND COMPELLING REASONS

To grant the Motion, the Court would have to determine that "extraordinary and compelling reasons" exist for Defendant's compassionate release. Defendant bears the burden to show that

---

[5] As suggested above, under *Jones*, the analysis of a defendant-filed motion differs from the analysis of a BOP-filed motion in that (among other ways) the latter kind of motion—to which § 1B1.13 remains applicable—requires an intermediate determination of whether the defendant-movant poses a danger to other persons or the community. *See* U.S.S.G. §1B1.13(2).

extraordinary and compelling reasons exist warranting his release. *United States v. Shabudin*, 445 F. Supp. 3d 212, 214 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at *3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

Defendant contends that his underling medical conditions (hypertension, hepatitis C, a damaged liver, and a weakened immune system) combined with the COVID-19 pandemic constitute extraordinary and compelling reasons for his release. (Doc. No. 116 at 5).

In its Response, the Government states that "Defendant does not have a chronic condition that the CDC has confirmed will cause him to face an increased risk of severe illness from COVID-19, [thus] his reasons for release are not 'extraordinary'[.]" (Doc. No. 119 at 8). The Government also argues that Defendant's reasons for release do not rise to the level of extraordinary and compelling reasons because Defendant "could have been inoculated against COVID-19, but he elected not to be." (*Id*. at 10 (citing Doc. No. 119-3)). The Government then cites a series of cases that it contends demonstrate that "[c]ourts around the country have noted that refusal to be vaccinated substantially diminishes arguments predicated on the risk presented by COVID-19." (*Id*. (citing *United States v. Wieman*, No. 4:19-CR-40003-06-KES, 2021 WL 425113, at *2 (D.S.D. Feb. 8, 2021) ("On December 30, 2020, Wieman was offered a vaccine, but refused. . . . This leads the court to believe that her fears of reinfection are overstated."); *United States v. Vogt*, No. 4:19-CR-40003-05-KES, 2021 WL 364652, at *4 (D.S.D. Feb. 3, 2021) ("Vogt recently tested negative for COVID-19 and refused a vaccine when offered one. . . . . Although the court in no way diminishes Vogt's health concerns, her conditions coupled with the present conditions at FCI Pekin, do not establish extraordinary and compelling reasons justifying her early release."); *United States v. Lohmeier*, No. 12 CR 1005, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) ("In declining

vaccination (twice), Mr. Lohmeier declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction."); *United States v. McBride*, No. 519CR00007KDBDCK1, 2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021) ("Although Defendant's diabetes could qualify as an extraordinary and compelling reason for granting compassionate release if it substantially diminished his ability to provide self-care against serious injury or death from COVID-19 within the environment of a correctional facility, it does not qualify as such in this instance. Defendant rejected the COVID-19 vaccine."); *United States v. Williams*, No. CR1701279001PHXDLR, 2021 WL 321904, at *3 (D. Ariz. Feb. 1, 2021) ("Defendant's [refusal of the vaccine] is inconsistent with his position that he believes he is at increased risk from the virus.")).

Although the Court agrees with the Government that Defendant's refusal of the COVID-19 vaccine seriously deflates any argument that he had regarding whether the risks posed to him by the COVID-19 virus (in consideration of his specific medical conditions) amounts to extraordinary and compelling reasons to justify his release, the Court need not decide today whether Defendant has met his burden to demonstrate that extraordinary and compelling reasons exists. The Court below decides that compassionate release is not available to Defendant even assuming *arguendo* that he is able to demonstrate extraordinary and compelling reasons.[6]

---

[6] *Jones* suggests that a district court has the discretion to assume *arguendo* that extraordinary and compelling reasons exist and then turn to the Section 3553(a) factors, inasmuch as *Jones* affirmed a district court that did exactly that. *See Jones*, 980 F.3d at 1108 ("Thus, the district judge in Jones's case permissibly assumed for the sake of argument that extraordinary and compelling circumstances existed[.]"). This appears to be an approach commonly taken by courts. *E.g.*, *United States v. Singleton*, No. CR 5:13-8-KKC, 2021 WL 614927, at *2 (E.D. Ky. Feb. 17, 2021) ("For purposes of this motion, the Court will assume that Singleton's health conditions amidst the COVID-19 pandemic in a prison setting present extraordinary and compelling circumstances that would warrant a sentence reduction. Even assuming, however, that extraordinary and compelling circumstances do exist that warrant a sentence reduction, the Court must still consider whether 'the factors set forth in section 3553(a) to the extent that they are applicable' support the requested sentence reduction.").

## II. SECTION 3553(a) FACTORS

The Government argues that Defendant's Motion should be denied because consideration of the Section 3553(a) factors militates against granting compassionate release to Defendant. (Doc. No. 119 at 11-14). The Court agrees, as reflected by the below analysis of factors. *See Jones*, 980 F.3d at 1112-13 (explaining that the district court must supply specific factual reasons in its consideration of the Section 3553(a) factors).

*The nature and circumstances of the offense* cut against compassionate release. During the instant offenses of conviction, Defendant possessed a firearm in a dangerous manner. (PSR at ¶ 7). The Government (correctly) summarizes the conduct underlying Defendant's instant conviction as follows:

> On June 1, 2013, the Trousdale County Sheriff's Department took a report from the Defendant's mother, sister, and niece about the Defendant's angry, erratic, and irrational behavior. (PSR, ¶10). The Defendant threatened to get an assault rifle and told his family members they could call the police, but he would be at the residence first. (*Id.*) That same day, the Sheriff's Department received information that a vehicle matching the description of the Defendant's vehicle engaged in threatening behavior in a parking lot in Hartsville, Tennessee. (*Id.*)
>
> On June 22, 2013, the Trousdale County Sheriff's Department received reports of a domestic disturbance in neighboring Macon County. (PSR, ¶ 11). The Defendant's wife, who barricaded herself inside her house, called 911 and requested an officer come to her house because the Defendant was sitting in the driveway. (*Id.*) The Defendant's wife reported the Defendant slept with a gun all night and threatened her. (*Id.*)
>
> The Defendant left the residence while officers were speaking with his wife, so a Trousdale Sheriff's Deputy drove to the Trousdale/Macon County line to see if the Defendant returned to Trousdale County. (PSR, ¶ 12). Within minutes, the Defendant passed by in his vehicle and was pursued by law enforcement, who activated their lights and sirens. (*Id.*) The Defendant drove recklessly for over two minutes and evaded officers on a rural two-lane highway and through neighborhoods. (PSR, ¶13). Oncoming traffic was forced to yield to the Defendant's vehicle and emergency vehicles even though there were no emergency lanes or shoulders. (*Id.*) Subsequently, the officers overtook the Defendant's vehicle and executed a "P.I.T. maneuver." (*Id.*) When the Defendant stopped, he was taken into custody. (*Id.*) He was the sole occupant of the vehicle. (*Id.*)

>       Inside the Defendant's vehicle, officers located a DPMS A-15, .223 caliber assault rifle with 4 matching high capacity magazines and a Beretta model 950-BS .22 caliber pistol. (PSR, ¶ 14). Neither of these firearms were manufactured in the state of Tennessee. (PSR, ¶ 17). When the DPMS rifle was sent to the Tennessee Bureau of Investigation for laboratory testing, it was discovered that the rifle was missing a "disconnector" effectively rendering it a machine gun pursuant to 26 U.S.C. § 5845(a). (PSR, ¶16).

(Doc. No. 119 at 4-5).

The Court finds that the above-described conduct, which involved flight and the illegal possession of a firearm, constitutes dangerous behavior that cuts against a shortened sentence. *See United States v. Young*, 580 F.3d 373, 378–79 (6th Cir. 2009) ("With respect to fleeing and eluding, if an offender is willing to drive recklessly to elude a police officer, without regard for the safety of bystanders or pursuing officers, it is likely that the offender would not hesitate to use a gun deliberately to harm a victim in another context. Moreover, fleeing and eluding itself is potentially more dangerous when firearms are involved. Given that fleeing and eluding, in the ordinary case, provokes a confrontation between the offender and an officer, a firearm could quickly change the confrontation from a scuffle to a shootout."). Furthermore, due to his prior felony, Defendant was prohibited from possessing firearms, yet did so anyway, evidencing his recidivism. *See United States v. Reed*, No. RDB-07-0470, 2020 WL 4732127, at *2 (D. Md. Aug. 14, 2020) ("[P]ossession of a firearm by a prohibited person, is in itself a serious crime and is indicative of [Defendant's] recidivism."). Relatedly, it tends to indicate a risk that Defendant would not comply with restrictions imposed on his conduct; which is vital because compassionate release would make sense only to the extent Defendant after release would comply with restrictions imposed by law, conditions of supervised release, etc. Based on these facts, the Court finds that the nature and circumstances of Defendant's underlying offense weigh against granting compassionate release.

*The history and characteristics of Defendant and the need to protect the public from further crimes of Defendant* cut against compassionate release.

The Government argues that this factor weighs against granting Defendant compassionate release because Defendant would pose a danger to the community if release. (Doc. No. 119 at 11). The Court agrees.

Defendant's criminal history indicates that Defendant has a history of violent conduct. Prior to his instant offense, Defendant was twice convicted of aggravated assault that arose out of domestic violence incidents with a former girlfriend. (PSR at ¶¶ 37, 38). In connection with one of his aggravated assault convictions, Defendant used a sledgehammer to damage his girlfriend's vehicle and kitchen counters and used a machete to threaten her. (*Id*. at ¶ 37). In connection with his other aggravated assault conviction, Defendant set a chair on fire, and when his girlfriend attempted to put out the fire, Defendant grabbed her and slammed her into a window. (*Id*. at ¶ 38).

Additionally, when Defendant was on bond in this case, four petitions for actions on the conditions of pretrial release were filed. (*Id*. at ¶¶ 10, 11). While on pretrial release, Defendant was arrested for two DUIs, violations of the implied consent law, and simple of possession of a Schedule II controlled substance (eight hydrocodone pills).[7] (*Id*. at ¶¶ 5, 7, 51). In addition, Defendant failed to report to pretrial release, failed to submit to a random drug screen, tested positive for methamphetamine twice, and reported using methamphetamine. (*Id*. at ¶¶ 5-9). Following the hearing on the fourth petition, Defendant's bond was revoked, and he remained in custody until sentencing. (*Id*. at ¶ 8).

---

[7] It is unclear from the record before the Court whether Defendant was eventually convicted on these charges, and the Court by no means presumes that this was the case. However, the Court believes that Defendant's arrests by themselves are at least worth noting as part of his history, if only to further make the point that Defendant cannot claim to have been issue-free while on release in this case.

While incarcerated, Defendant has continued to struggle to follow rules and conform his conduct to societal norms, as he received a disciplinary infraction for assaulting another inmate. (Doc. No. 119-4).

The Court finds that based on the above-described conduct, the history and characteristics of Defendant, and the need to protect the public from further crimes of Defendant, weigh against granting compassionate release. The Court does not presume this merely because Defendant is currently incarcerated for serious offenses. The inquiry is more comprehensive than that, involving most significantly a review of Defendant's entire criminal history. Combined with his current offense, his criminal record, which includes violent criminal conduct that occurred multiple times—prevents the Court from concluding that Defendant would not pose a danger to the community if released. Additionally, his litany of pretrial release violations unfortunately suggests that Defendant perhaps would not limit the danger he poses to the public by abiding by his conditions of supervised release. Ultimately, Defendant's criminal record and continuous inability prior to the instant offenses to correct his criminal behavior demonstrates his repeated disrespect for the law and a substantial possibility (though admittedly, and fortunately, not a certainty) of recidivism. Accordingly, the Court concludes that these things weigh against granting compassionate release.

*The need to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor of compassionate release for Defendant. The Court will first focus on Defendant's medical need to avoid a COVID-19 infection and, failing that, to avoid a poor outcome from a COVID-19 infection.

The Court will not act like it knows the extent to which Defendant's chances of COVID-19 infection would be lower if he is released than if he stays in BOP custody, or how much more likely a bad outcome upon infection would be for him as opposed to someone without his medical condition. As matter of sheer epistemology, the undersigned cannot and does not know such things; this is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as some seem to have reversed themselves on various issues over time.[8] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been in constant flux, and it would be folly for the Court to rely blindly on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is willing to accept that Defendant is at substantial risk of COVID-19 infection at FCI Talladega, as there are currently 48 active COVID-19 cases in the facility. *See COVID-19*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed Mar. 4, 2021). The Court is also willing to assume that Defendant's medical conditions make him prone to relatively bad outcomes in case of infection.

But that does not mean that these circumstances ultimately support compassionate release. For one thing, the Court would merely be speculating as to the extent of the risk of infection at FCI Talladega and as to the likelihood of a bad outcome upon infection. For another thing, to say

---

[8] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; the extent to which COVID-19 may be transmitted via contact with inanimate surfaces; and whether an effective vaccine could be rolled out during calendar year 2020.

the least, it is not like there in no substantial risk of infection outside of BOP custody; it is a matter of public record that COVID-19 cases continue to occur across the United States. To the extent that the pandemic seems to be abating at least somewhat[9] (perhaps due to ongoing vaccination and/or a beginning of a semblance of "herd immunity"), this actually hurts Defendant's position. Any attenuation of the threat of COVID-19 generally reasonably can be associated with attenuation of the threat of COVID-19 at FCI Talladega, which is of course the very basis for Defendant's request for compassionate release. Additionally, in the Court's view, Defendant himself does not seem to think that he is at a significant risk from COVID-19, because he refused the COVID-19 vaccine when offered to him at FCI Talladega.

Additionally, given Defendant's history of criminal activity (including his pretrial release violations and disciplinary infraction while incarcerated), Defendant unfortunately has demonstrated an unwillingness and/or inability to comply with rules and societal norms in at least some important respects. This is vital because the consensus is that decreasing his risk of infection upon release from BOP custody would require him to observe public/health and societal norms related to COVID-19, such as handwashing, face-covering and social distancing.

Further, BOP is working diligently to distribute the COVID-19 vaccine in its facilities, with 65,328 total vaccine doses already administered to BOP staff and inmates. *See COVID-19 Vaccine Implementation*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed Mar. 4, 2021). Specifically, FCI Talladega, where Defendant is incarcerated, has inoculated 116 staff members and 313 inmates as of today's date. *Id*. Although Defendant refused the vaccine, early research has demonstrated that vaccines are able to reduce transmission rate of the virus. *See*

---

[9] *See Coronavirus Case Count*, Washington Post, https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=lk_inline_manual_3 (last accessed Mar. 3, 2021).

*Pfizer Vaccine Appears to Reduce Coronavirus Transmission*, ScienceNews, https://www.sciencenews.org/article/coronavirus-covid-19-pfizer-vaccine-may-reduce-transmission (last accessed Mar. 4, 2021). Thus, the vaccination efforts by BOP will likely reduce the risk that Defendant will contract COVID-19 in a BOP facility. For all of these reasons, there is no good basis to believe that Defendant's release is likely *in actuality*—not just theory—to substantially reduce his risk from COVID-19.

But perhaps most importantly, the Court cannot possibly say that in order to minimize Defendant's risk from COVID-19, Defendant *must be released*. On the contrary, he has an option that is, based on extant information, far more likely to minimize his risk: taking the vaccine. The Court does not presume to tell Defendant he must take the vaccine; that is solely his decision to make. But the fact that he *could* choose to take the vaccine—and thus decrease his risk of infection to a huge extent—means that his concerns about COVID-19 can be (and apparently already could have been) addressed in a way already employed by (reportedly) tens of millions of Americans. Release is not necessary to nearly eviscerate Defendant's risk from COVID-19, and Defendant certainly cannot obtain the extraordinary remedy of supervised release by the simple expedient of voluntarily keeping his risk relatively high by declining the vaccine.

*The sentencing guidelines and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* do not support compassionate release. The guideline sentence for Defendant was 120 months. (PSR at 29). The Court sentenced Defendant to serve 96 months of imprisonment, a below-guidelines sentence, pursuant to the parties' plea agreement. (*Id.*). Having specifically requested this sentence pursuant to Rule 11(c)(1)(C), Defendant conceded that the sentence as originally imposed was appropriate, and not too high. So a sentence substantially lower than 96 months represents a disparity from

what otherwise would be an appropriate sentence, and the question is whether the requested modified sentence would be disparately low, or whether instead it would be warranted based solely on the risk to Defendant from COVID-19.

The Court first looks at what the requested modified sentence actually would be. According to the BOP, Defendant has roughly 25 and a half months of his sentence left to serve. *See* Federal Inmate Locator, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Mar. 4, 2021) (listing Defendant's projected release date as April 25, 2023). From the PSR, it appears that Defendant gained well over a year of credit towards his sentence prior to sentencing, based on pre-sentencing detention. But the Court cannot tell exactly how much credit Defendant earned, and for this and other reasons (including that the Court cannot say for certain how much credit for good-time served is reflected in BOP's calculation of Defendant's release date), the Court would be speculating as to how much time Defendant has been credited towards serving his sentence thus far. But viewing this question in Defendant's favor by assuming the maximum possible amount he could have earned thus far based on the PSR, he has been accruing credit since July 29, 2016 and would have accrued about an additional month-and-a half of credit prior to that time. Thus, erring on Defendant's side, the Court perceives Defendant to have effectively served in total approximately 57 months on this sentence thus far. In other words, the sentence Defendant requests represents a modified sentence of approximately 57 months at most. This constitutes approximately 59 percent of his sentence without considering any possible credit for good-time served, and approximately 69 percent of his credit assuming maximum credit for good-time served (which would mean a sentence to serve of approximately 82 months).

Although Defendant has served the majority of his below-guideline sentence, the modified sentence he requests would nevertheless be a major reduction from what Defendant conceded was

an appropriate sentence, and it would likewise represent downward variance of more than 50 percent from his guidelines sentence. And this fact may weigh against his release. *See United States v. Kincaid*, 805 F. App'x 394, 395-96 (6th Cir. 2020) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions); *Ruffin*, 978 F.3d at 1008 (affirming district court's denial of motion for compassionate release, in part because the defendant-inmate "has yet to serve even half of his 25-year sentence" and because "the court had already varied downward" by one-sixth the bottom of the guideline range). Although the guidelines of course are advisory only, and there is nothing wrong with below-guidelines sentences in general, the Court can (and in this instance does) treat such a requested variance as tending to frustrate the objective of avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

The Court also notes that the theory behind Defendant's Motion—that he needs to be released because of the risk COVID-19 poses to him while incarcerated—would simply not make sense had he chosen to take the vaccine. For this reason, the requested modification of his sentence to a term very far below his guideline range (one which likely would be disparately low considering national rates and percentages of downward variances) would be the direct result of his declination of the vaccine. A disparately low sentence is fine under certain circumstances, *i.e.*, when *warranted*. But it is unwarranted to the extent it would result from Defendant's voluntary and personal choice not to take the vaccine.

Accordingly, the Court finds that to grant Defendant compassionate release would create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. The Court also notes that the fact that Defendant has served nowhere

near all of his sentence can weigh against Defendant not only on this factor, but also on other factors. *See Ruffin*, 978 F.3d at 1008 ("We have recognized that some of the § 3553(a) factors, including the "need to provide just punishment" and "to reflect the seriousness of the offense," allow courts to consider the "amount of time" that a defendant has served on a sentence when deciding whether to grant a sentence reduction."); *see also Jones*, 980 F.3d at 1115 (affirming the district court's denial of the defendant's compassionate release motion where the district court examined the Section 3553(a) factors and reasoned that the factors weighed against granting the motion because, among other things, the defendant "had served only two years of his decade-long sentence [for non-violent drug offenses] and that [the defendant] was a repeat offender").

Additionally, the Court cannot say that requested reduction of the Court's original sentence would fully reflect the seriousness of the offense Defendant committed, provide a just punishment for his conduct, and promote respect for the law. For those reasons, the Court finds that the Section 3553(a) factors also weigh in favor of denying Defendant's Motion.

## CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable here, given that it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, the Motion (Doc. No. 116) is **DENIED**.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE